**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRACY FORWARD FOUNDATION, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>U.S. GENERAL SERVICES ADMINISTRATION, )<br><br>*Defendant*. ) | Case No. 1:18-cv-01037-APM |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At issue here is whether records generated by a private entity become agency records subject to the Freedom of Information Act, 5 U.S.C. § 552, ("FOIA") when maintained by a federal agency who has assumed control over the records by retaining them indefinitely, unilaterally disclosing some of them to other agencies, and restricting access to them by the originating entity. The answer under the various tests articulated by the D.C. Circuit is yes.

Historically, the General Services Administration ("GSA") has provided telecommunications and internet technology ("IT") support to presidential transition teams through Inauguration Day. As part of the typical winddown of these services, GSA has deleted any transition team records in its possession. Yet GSA's treatment of such records created by the Trump Presidential Transition Team ("PTT") has been anything but typical. Rather than delete the records in its possession—primarily emails stored in a cloud server—GSA determined to preserve the records without notifying the PTT. On its own initiative, it subsequently released the records to the FBI without a subpoena or other legal process while at the same time denying the

1

PTT access to the retained records. Among these records were materials that the PTT claims were privileged. GSA's exercise of control over the records therefore transformed them into agency records subject to FOIA.

Plaintiff, Democracy Forward Foundation, submitted a FOIA request to GSA that undisputedly requests a subset of these records, yet GSA has refused to produce them. Plaintiff now respectfully requests that the Court grant its Motion for Partial Summary Judgment— determining that the records at issue are agency records subject to the FOIA—and order GSA to produce all responsive, non-exempt records to Plaintiff promptly.

### Background

Pursuant to statute, GSA is authorized to provide various services, including telecommunications and IT services, to presidential transition teams. Presidential Transition Act of 1963, Pub. L. 88-277, 78 Stat. 153, 3 U.S.C. § 102 (note). GSA provides the services to both major party candidates in advance of the presidential election, and to the President-elect's transition team following the election. *See, e.g.*, Def. GSA's Statement of Material Facts as to Which There is No Genuine Dispute ("Def. SMF"), Dkt. No. 11-3, ¶ 8. GSA provided such services to the PTT during 2016 and early 2017. Def. SMF ¶¶ 8-12. The agreement between the PTT and GSA was memorialized in a memorandum of understanding. *Id.* ¶ 10 (citing Mem. of Understanding Between the GSA and Donald J. Trump, Decl. of Michael J. Gerardi, Ex. A, Dkt. No. 11-2 ("MOU")). As part of this agreement, GSA provided the PTT with software and equipment, including laptops and smartphones, and provided PTT members with GSA-supported email addresses through Google's cloud-based services. *Id.* ¶¶ 12, 14, 15. As part of the MOU, the PTT was warned that "[e]nd-users should have no expectation of privacy with respect to the use of PTT IT assets and personal IT assets connecting to the PTT guest wireless, including any information received by, sent from, or stored in/on PTT IT assets." *Id.* ¶ 13.

The MOU provided that the PTT's "equipment will be returned by February 19, 2017. This equipment will be inventoried and all data on these devices will be deleted." *Id*. ¶ 12 (citing MOU at 10). The MOU does not discuss how cloud-based email will be managed following the termination of GSA's services to the PTT. *See* MOU. In January 2017, the PTT and GSA agreed to extend GSA's services to the PTT, including IT support, through March 31, 2017, by which date all government-furnished IT equipment was to be returned. *Id*. at 22.

At some point in the late winter or early spring of 2017, following Inauguration Day, GSA initiated a preservation of the PTT records. *See* Plaintiff's Statement of Material Facts Not in Dispute ("Pl. SMF") ¶ 1. In a June 8, 2017 email to Lennard Loewentritt, GSA's Deputy General Counsel, a GSA senior attorney relayed information from a call with Special Counsel Robert Mueller's staff, including the attorney's statement to the Special Counsel's staff that:

> I also explained normally GSA would destroy the records and wipe the machines, but given the news cycles, GSA decided it was prudent to inquire about preservation during the machine wiping process. So we reached out to the [GSA Inspector General], who contacted the FBI or DOJ and got the ball rolling for GSA's preservation of records. The records were copied and are on a thumb-drive so no access to anything else needs to be done right now to provide copies. …
>
> I mentioned that the PTT did mention access to machines, but I explained GSA will not allow that given the possible impact on evidence.

*See* Decl. of Batul Contractor ("Contractor Decl."), Ex. 6.[1] A March 9, 2017 email from the FBI's General Counsel to Mr. Loewentritt is consistent with this account. *See* Contractor Decl., Ex. 5. That email requested that GSA preserve stored records and devices of one or more individuals (the names are redacted) of the PTT. *See id*. The email plainly does not request preservation of all PTT members' records and devices. *See id*. (identifying "a cellular telephone" used by or associated with the redacted name(s) and referring to "devices and information

---

[1] This email was obtained by a Buzzfeed News reporter pursuant to a FOIA request. *See* Contractor Decl. ¶ 9.

associated with other members of the presidential transition team" that the FBI "understand[s] remain in GSA's possession"). And, notably, the FBI General Counsel thanks Mr. Loewentritt "for bringing this to our attention and working with us to preserve this material." *Id.*

GSA was also engaged in ongoing correspondence with the FBI about the records it had preserved. In May 2017, Deputy General Counsel Loewentritt requested "guidance" from an individual in the FBI's Office of General Counsel "about requests for documents from the attorney representing the Trump transition." *See* Contractor Decl., Ex. 9. In response to a request from the FBI, GSA produced "materials related to GSA's support of the Presidential Transition" on or about June 9, 2017. *See id.*, Ex. 10. On June 16, 2017, the same GSA senior attorney sent another internal GSA email that summarized another call with the Special Counsel's staff, stating:

> GSA is in receipt of various record hold and production requests for Presidential Transition Team (PTT) records that are in the physical custody of GSA based on GSA's administrative support to the PTT. … Up to this point, DOJ was trying to determine what the records were and other parameters around what GSA potentially has in its custody, and GSA has been very helpful in answering those questions, but that as of today, GSA is not being asked to send any PTT documents to DOJ. DOJ will decide how to proceed and if records are requested from GSA, a subpoena will be issued or a search warrant will be executed.

*See id.*, Ex. 7. On June 22, 2017, apparently for the first time, the FBI sent GSA "an official preservation letter" for "all Documents and Responsive Materials." *See id.*, Ex. 11.

GSA ultimately produced certain PTT records to the FBI. On August 23, 2017, the FBI sent GSA a "request" to provide certain documents and responsive materials in its possession to the FBI. *See* Contractor Decl., Ex. 12. On August 30, 2017, the FBI sent an email to GSA stating "[w]e have additional [redacted] individuals we are currently interested it [sic]. Attached is a new letter requesting the information." *Id.*, Ex. 13 at 1. GSA responded to the August 23, 2017

and August 30, 2017 production requests from the FBI by producing records on August 31, 2017. *See id.*, Ex. 14.

GSA provided the PTT records to the FBI without a subpoena or legal process. *See* Contractor Decl., Exs. 12, 13; *see also id.* Ex. 15 ("PTT Letter") at 4. GSA provided the PTT records to the FBI without informing the PTT that it was doing so or filtering or redacting privileged material. PTT Letter at 4. This led the PTT to complain to Congress that the Special Counsel had received "a very significant volume of privileged material" and had reviewed the same. *Id.* at 5. The PTT also asserted in its letter to Congress that existing statutory requirements were inadequate to protect its records from disclosure by GSA. *Id.* at 5-7.

### Procedural History

On January 5, 2017, Plaintiff submitted a FOIA request to GSA requesting:

> Any and all correspondence, including attachments, to or from 'ptt.gov' email addresses associated with Rick Dearborn, Mike Pence, Michael Flynn, Rudy Giuliani, Chris Christie, Jeff Sessions, Ben Carson, K.T. McFarland, Pam Bondi, Jared Kushner, Rebekah Mercer, Steven Mnuchin, Devin Nunes, Anthony Scaramucci, Peter Thiel, Reince Priebus, Steve Bannon, Donald Trump Jr., Eric Trump, Ivanka Trump, and Omarosa Manigault on any server controlled by the General Services Administration.

Contractor Decl., Ex. 1. On February 8, 2018, GSA responded, stating that "After a careful review of our files, it has been determined that GSA has no records of the information that you have requested." *Id.*, Ex. 2. Plaintiff appealed the no records determination on March 9, 2018, based in part on public reporting that GSA had retained PTT records on a GSA server. *Id.*, Ex. 3. GSA denied the appeal on April 12, 2018, stating that "[w]hile presidential transition team (PTT) emails were held on GSA servers, these were not considered agency records." *Id.*, Ex. 4.

Plaintiff filed its Complaint on May 2, 2018. *See* Dkt. No. 1. Thereafter, the parties agreed to have GSA produce a small subset of responsive records that GSA did not dispute were agency records. *See* Dkt. No. 8. GSA made this production on July 6, 2018. Those records are

not at issue in this litigation. The issue presently before the Court is whether the withheld PTT emails are agency records.

## Standard of Review

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a court is applying this standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). FOIA cases often are appropriately decided on motions for summary judgment. *Long v. Immigr. & Customs Enf't*, 149 F. Supp. 3d 39, 47 (D.D.C. 2015). A court may award summary judgment in a FOIA case using solely the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *Dep't of Justice v. Rep. Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## Argument

### I.     The PTT records at issue became agency records as a result of GSA's treatment of them.

"[D]ocuments may be considered 'agency records'—a term not defined in the [FOIA]— if the documents are created or obtained by an 'agency' that receives the FOIA request and are in that agency's 'control'—that is, in 'the agency's possession in the legitimate conduct of its official duties.'" *Cause of Action v. Nat'l Archives & Rec. Admin.*, 753 F.3d 210, 212 (D.C. Cir.

2014) (quoting *Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 144–45 (1989)). "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records'" *Tax Analysts*, 492 U.S. at 142 n.3.

There is no dispute that the records in question were "obtained" by GSA, leaving only the question of whether they are in GSA's control. In some cases, the D.C. Circuit has considered "four factors to determine whether an agency controls a document." *Cause of Action*, 753 F.3d at 212 (quoting *Judicial Watch, Inc. v. Fed. Hous. Fin. Agency* (*Judicial Watch I*)*,* 646 F.3d 924, 926 (D.C. Cir. 2011)). The factors are

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the records as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Id.* at 212-13 (original quote from *Burka v. Dep't of Health & Human Servs.,* 87 F.3d 508, 515 (D.C. Cir. 1996)). Collectively, they are typically referred to as the *Burka* test and are evaluated holistically. *See Judicial Watch, Inc. v. Secret Serv*. (*Judicial Watch II*), 726 F.3d 208, 220 (D.C. Cir. 2013) (noting that in some cases, the court has found that documents were not agency records "when fewer than all four factors pointed in that direction," and in other cases, the court has found the contrary "even though fewer than four factors indicated as much"). Of note, documents that were not considered agency records when they came into an agency's possession may become agency records depending on how they agency treats them, namely whether it brings them into its control. *See*, *e.g. Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 347 (D.C. Cir. 1978) ("Whether a congressionally generated document has become an agency record, rather, depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides.").

7

GSA's departure from historical practice in its treatment of the PTT's records, including its determination to preserve them on its own initiative, to deny the PTT access to certain portions of the records, and to produce them to the FBI without notifying the PTT or giving it an opportunity to screen the records for privilege demonstrate that GSA in fact controlled the records. Coupled with the PTT's failure to demand that GSA return the records to it or delete them as planned, there can be no question that the withheld records are agency records subject to the FOIA.

> **A.     There is no per se prohibition on treating presidential transition team records as agency records under appropriate circumstances.**

As an initial matter, while Defendant is correct that presidential transition team records that pass through an agency's possession have not been considered agency records, the limited case law on this question does not recognize a per se bar to a contrary finding in the appropriate circumstance. In *Wolfe v. Department of Health & Human Services*, the D.C. Circuit considered reports compiled by President-elect Reagan's transition team, which an agency employee had placed in a locked, glass bookcase in his office marked personal. No agency employee used or consulted the documents. 711 F.2d 1077, 1078 (D.C. Cir. 1983). The court declined to hold that the report had become an agency record simply based on its physical location, stating that there was no "real nexus between the documents and the agency other than their physical location." *Id.* at 1080 (citing *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 157 (1980)). The court also noted that the record's original owners never surrendered their "exclusive, private control over the reports." *Id. Wolfe*, however, makes clear that under certain circumstances, transition team records may come within an agency's control such that they may be subject to FOIA. *Id.* at 1081 (analyzing whether transition team records came within the agency's control). Substantially similar factual circumstances also led the court in *Illinois*

8

*Institute for Continuing Legal Education v. Department of Labor* to hold that the agency did not have control over transition team briefing books that happened to be physically located within the agency. 545 F. Supp. 1229, 1235 (N.D. Ill. 1982). Again, the court's decision makes clear that in appropriate circumstances transition team documents could become agency records subject to the FOIA. *Id*. at 1234 (discussing whether the transition team records "acquired th[e] status" of agency records).

As shown below, those circumstances are present here.

**B.      The PTT's failure to exercise diligence in retaking custody of the PTT records or ensuring their deletion indicates that the PTT did not intend to retain control over the records.**

The PTT's lack of diligence with respect to its records in GSA's possession tilts the first *Burka* factor—"the intent of the document's creator to retain or relinquish control over the records"—in favor of determining that the emails are agency records. *Burka*, 87 F.3d at 515. Defendant argues that the terms of the MOU signed by the PTT were sufficient to establish that the PTT intended to retain control over the records at issue. Mem. of Law in Support of Def.'s Mot. for Summ. J. ("Mot."), Dkt. No. 11 at 16-18. This argument may be correct for the normal period of GSA services to a presidential transition team, but does not hold where, as here, following Inauguration Day and long after, the PTT did not exercise diligence either in retaking custody of the PTT records from GSA or in attempting to ensure their deletion.

The MOU provides that the data on telecommunications and IT equipment be "deleted" after return by the PTT, with return to occur by February 19, 2017 (or, here, as extended). MOU at 10. Of note, although email services were provided through a cloud-based service both for the 2012 Romney pre-election transition and the Trump transition, *see* Declaration of Erik Simmons, Dkt. No. 11-1, ¶¶ 6, 9, the MOU discusses only deletion of data stored on GSA-provided equipment. *See* Def. SMF ¶¶ 11-12. The PTT appears not to have requested or received any

written assurance that cloud-based information—the emails at issue here—would be deleted following the transition team's winddown.

Nor does it appear that the PTT acted to retain control of the cloud-based records following Inauguration Day and over the course of GSA's retention of those records. Defendants identify no communications between the PTT and GSA regarding whether PTT records in GSA's possession were deleted following Inauguration Day. While a December 16, 2017, PTT letter to Congress regarding its records in GSA's possession makes a statement suggesting that it directed GSA to dispose of certain PTT email archives, it does not identify any time frame provided by the PTT for the destruction of those records, nor any subsequent attempt to confirm whether such destruction occurred. *See* PTT Letter at 3. The PTT did not appear to communicate further with GSA regarding these records for "approximately two months." *Id*. The PTT's failure to exercise due diligence to ensure its records were disposed of indicates that it did not intend to retain control, or at the very least waived its claim to control. *Cf. Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 253 (D.D.C. 2004) ("The holder of the [attorney client] privilege "must zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure.") (quoting *SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997); *see also In re Grand Jury (Impounded)*, 138 F.3d 978, 981 (3d Cir. 1998) (finding waiver of attorney work product where suspect failed to take reasonable steps to preserve privilege of inadvertently disclosed documents).

Further, when the PTT became aware of third-party preservation requests regarding its records, it delegated such preservation work to GSA rather than seeking to take control of the records on its own. *See* PTT Letter at 3. Once it became clear that GSA would not be disposing of the records per historical practice, the PTT's decision to permit GSA to continue retaining

them counsels against the conclusion that the PTT intended to retain control of the records. While the PTT subsequently raised concerns with Congress about GSA providing certain records to the Special Counsel without the PTT's permission, the PTT does not identify any preventive or subsequent action that it took with regard to GSA (or the Special Counsel for that matter) to seek to obtain the records in GSA's possession. *Id.* at 3-5. Courts' treatment of privileged documents is again instructive—just as attorney-client or work product privilege may be waived where a party does not seek to recover a record after inadvertent disclosure, the PTT's failure to attempt to reacquire the records from GSA after it became clear that GSA was releasing them without the PTT's permission or opportunity to review requires determining that the PTT had waived its claim to control over them. *See Bowles v. Nat'l Ass'n of Home Builders,* 224 F.R.D. 246, 253 (D.D.C. 2004); *see also United States v. de la Jara,* 973 F.2d at 749-50 (9th Cir. 1992) (finding waiver of attorney-client privilege where defendant failed to take reasonable steps to recover involuntary disclosed document)

Thus, the lack of a clearly expressed intent to retain control when it became clear that the records were no longer being treated by GSA as normal transition team records counsels in favor of finding that they are agency records. *See, e.g.*, *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 602 (D.C. Cir. 2004) (expectation of confidentiality based on past course of dealing between Congress and agency was insufficient to establish Congressional intent to retain control of record) (citing *Paisley v. CIA*, 712 F.2d 686, 695 (D.C. Cir. 1983), opinion vacated in part, 724 F.2d 201 (D.C. Cir. 1984) (rejecting letters offered to prove such an agreement as "too general and sweeping to provide ... the requisite express indication of a congressional intent to maintain exclusive control over [the] particular records [at issue]")); *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 841 (D.C. Cir. 1980), *vacated in part sub*

*nom. CIA v. Holy Spirit Ass'n of the Unification of World Christianity*, 455 U.S. 997 (1982)

(Congressional failure to indicate intent to maintain control over documents transferred to

agency meant they were agency records subject to FOIA).

### C.   GSA exercised control over the use and disposal of the PTT records.

The second *Burka* factor—the ability of the agency to use and dispose of the record as it

sees fit—also weighs in favor of determining that the records at issue are agency records. *Burka*,

87 F.3d at 515. While GSA may not have had the authority to use and dispose of the records as it

saw fit during the normal course of the Presidential transition, it necessarily assumed that

authority when it independently decided to preserve the records rather than dispose of them, to

limit PTT access to them, and to turn them over to the Special Counsel without the PTT's

consent.

Defendant asserts that GSA preserved all transition team communications following a

February 2017 request from the Justice Department. Def. SMF ¶ 14. GSA communications in the

public record suggest that, in fact, the agency began the hold on its own initiative. In June 2017,

a GSA Senior Assistant General Counsel emailed Lennard Loewentritt, GSA Deputy General

Counsel, with the subject line, "Call with Special Counsel Staffer." Referring to the PTT records,

he stated:

> I also explained normally GSA would destroy the records and wipe the machines,
> but given the news cycles, *GSA decided it was prudent to inquire about
> preservation during the machine wiping process,* so we reached out to the IG,
> who contacted the FBI or DOJ and got the ball rolling for GSA's preservation of
> records. The records were copied and are on a thumb drive so no access to
> anything else needs to be done right now to provide copies.

Contractor Decl., Ex. 6 (emphasis added); *see also id.*, Ex. 5.[2] GSA therefore was not merely warehousing the records, as Defendant would have it, until it received a preservation request. On the contrary, GSA appears to have played a significant role in initiating the preservation of records itself. This action reveals independent decision-making as to the disposition of the records, which was not governed by the MOU or prompted by a request from law enforcement. Unlike *Judicial Watch II,* 726 F.3d at 219, the agency's use of the records here exceeded the bounds explicitly permitted by its agreement with the originating entity, and therefore counsels in favor of determining that the records are agency records.

Further, at some point in the spring of 2017, GSA refused to permit the PTT to access the electronic equipment it was preserving, indicating that GSA had assumed control over the records. *See* Contractor Decl., Ex. 6 ("In addition, I mentioned that the PTT did mention access to the machines, but I explained *GSA will not allow that given the possible impact on evidence*.") (emphasis added). It is difficult to imagine a scenario—nor do the cases relied on by the government suggest one—where an agency would not be deemed to have control of records for which it had *refused* access to the records' originator.

GSA also exercised control over the preserved records when it provided them to the FBI based upon a letter request, not a subpoena or legal process. *See* Def. SMF ¶ 9.[3] GSA provided the records, even though GSA previously had opined that it "thought a subpoena was necessary

---

[2] While GSA staff also expressed the view that the records at issue were not agency records subject to the FOIA in email correspondence quoted by Plaintiff, it is GSA's actions that are determinative here. In any event, GSA staff did not consider or account for GSA's unusual treatment of the records—the dispositive fact here—in the statements repeating GSA's typical view that transition team records are not subject to FOIA.

[3] *See also* PTT Letter at 4 ("on August 23, 2017, the FBI sent a letter (i.e., not a subpoena) to career GSA staff requesting copies of the emails, laptops, cell phones, and other materials associated with nine PTT members responsible for national security and policy matters. On August 30, 2017, the FBI sent a letter (again, not a subpoena) to career GSA staff requesting such materials for four additional senior PTT members.").

[to provide the records to law enforcement] as they are not GSA's records." Contractor Decl., Ex. 6; *see also id.*, Ex. 7 (email from GSA staff documenting conversation with Special Counsel's office: "DOJ will decide how to proceed and if records are requested from GSA, a subpoena will be issued or a search warrant will be executed."). According to the PTT, one consequence of the GSA having done so is the PTT's loss of the opportunity to assert privilege over the materials. *See* PTT Letter at 4 ("Career GSA staff, working with Mr. Loewentritt and at the direction of the FBI, immediately produced all the materials requested by the Special Counsel's Office – without notifying [the PTT] or filtering or redacting privileged material. … We understand that the Special Counsel's Office has subsequently made extensive use of the materials it obtained from the GSA, including materials that are susceptible to privilege claims"). Transferring custody of the records without legal process and waiving privilege claims for the originator of the records indicates that GSA was using and disposing of the records as it saw fit, consistent with it having control over the records.

Thus, GSA's control of the records—demonstrated by its unilateral decision to preserve them, voluntarily disclose them to law enforcement agencies, and restrict PTT's access to them—counsels in favor of finding that the records are subject to FOIA.

### D.   The remaining *Burka* factors support the conclusion that the records are agency records.

Among GSA's official functions, it provides communications services to presidential transition teams. Its execution of this function with regard to the PTT exceeded its statutory duties and diverged from the MOU it signed with the PTT and its past practice following the inauguration of a new President. The requested records could therefore "reveal something about agency decisionmaking," *Cause of Action*, 753 F.3d at 215 (quotation omitted), namely how GSA viewed and executed this function, and in particular how it transitioned the function from

14

passive IT support to proactive control. This possible insight into GSA functioning makes the third and fourth *Burka* factors support the conclusion that the records at issue are agency records.

Although the government portrays GSA's treatment of the PTT records primarily as passive IT support, over time, GSA increasingly treated them as body of information containing information potentially relevant to an investigation that it had compiled and was managing on the FBI's behalf. GSA deviated from its typical provision of communications services with regard to the PTT when it initiated a hold on the PTT records and provided them to the FBI without the permission of the PTT. It did so based upon GSA staff's awareness of the substance of the records: GSA staff's knowledge of the identity of PTT members, their work as part of the PTT, and the relevance of this work to the ongoing Special Counsel and FBI investigations informed the decision to preserve the records at issue. *See* Contractor Decl., Ex. 6 ("given the news cycles, GSA decided it was prudent to inquire about preservation during the machine wiping process"). Nor does Defendant establish that GSA's decision to preserve the records could not have been based, at least in part, on GSA staff's awareness of the actual content of the records—whether encountered inadvertently through IT support services or otherwise. *Cf.* Def. SMF ¶ 15 (stating *only* that GSA did not read, search, or review the data when determining what to produce to the FBI in August 2017).

GSA's treatment of the records as a law enforcement file it was managing on behalf of the FBI continued well past Inauguration Day, into the spring and summer of 2017. For example, in May 2017, GSA asked the FBI for "guidance" about how to respond to requests for the documents from counsel for the PTT. Contractor Decl., Ex. 9. As discussed above, in June 2017, GSA denied the PTT's request for access to the equipment. *Id.*, Ex. 6. GSA provided "helpful" information to the FBI about "what the records were and other parameters around what GSA

potentially has in its custody." *Id.*, Ex. 7. In addition to the records that GSA provided to the FBI in August 2017, *see* Def. SMF ¶ 15, it also told the FBI it would provide "materials related to GSA's support of the Presidential Transition" by June 9, 2017. The Defendant's Motion for Summary Judgment avoids many of the nuances and details of GSA's treatment of the PTT records, facts which reveal the agency's novel execution of its responsibilities under the Presidential Transition Act.

Instead, the government relies heavily on a formalistic application of the third and fourth *Burka* factors, asserting that because GSA segregated the records and its staff did not read them when providing them to the FBI they could not be agency records. Yet the D.C. Circuit has expressed doubt as to whether such an approach is appropriate in all circumstances. *See Cause of Action v. NARA*, 753 F.3d at 215 ("We have questioned whether the *Burka* test is helpful delineating that distinction [regarding agency control of material]. 'Our past application of the test reveals its considerable indeterminacy.'") (quoting *Judicial Watch II*, 726 F.3d at 220). In certain circumstances, the question is "sui generis" and not bound by strict analysis under the traditional four factors. *Id.* GSA's segregation of the records and its statement that its staff did not read the records to facilitate their transfer to the FBI, Def. SMF ¶ 9, is not, therefore, dispositive. Another court in this District determined that third-party created records were agency records subject to FOIA based on the totality of the agency's relationship to the records, even though there was no evidence before the Court that agency staff had read and relied on the records in question. *See In Def. of Animals v. Nat'l Institutes of Health*, 543 F. Supp. 2d 83, 100 (D.D.C. 2008) (noting that agency personnel "can access" the records at issue, not that they had so accessed the records). Indeed, in *Department of Justice v. Tax Analysts*, the Supreme Court's seminal case on the meaning of "agency records" under the FOIA, the tax court decisions at

issue had been passively received by the agency and agency employees' review of the materials did not factor into the Court's analysis. 492 U.S. at 149.

The question of how the agency used the records here is similarly sui generis. GSA exerted power over the records at issue here, to the detriment of the entity it now asserts had legal control, the PTT. In so doing it exceeded its statutory responsibilities in both the Presidential Transition Act and the MOU with the PTT. In contrast, several of the cases relied on by the government involve third-party records that came into an agency's possession through its normal functioning. *See*, *e.g.*, *Cause of Action*, 753 F.3d 210 (Congressional Commission's records deposited in National Archives); *Judicial Watch I*, 646 F.3d 924 (Fannie Mae and Freddie Mac records in FHFA's possession as a result of statutory authority to place the two companies into conservatorship). These cases do not control the outcome here, as GSA stopped treating the PTT records as it would in the normal course when it did not destroy them per its typical and expected practice and instead began treating them as a body of information it had compiled and over which it had responsibility to manage and preserve. Subjecting the records to FOIA would therefore be instrumental in revealing GSA's purposes and motivation in assuming control over them and how GSA treats its responsibilities under the Presidential Transition Act, 3 U.S.C. § 102 (note), information consistent with FOIA's purpose of contributing to public understanding of the operations and activities of the government. *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989).

II.     **"Special policy considerations" that have prevented disclosure of Congressional and White House records do not apply to PTT records.**

Defendant's argument that "special policy considerations" prevent application of the FOIA to the PTT records held by GSA is incorrect. As the D.C. Circuit has repeatedly made clear, such considerations apply only when the records at issue were created by or at the instance

a branch of government, such as Congress or the President, that it not subject to the FOIA. *Cause of Action*, 753 F.3d at 215. In such circumstances there is a "constitutional prerogative" against disclosure. *Judicial Watch II*, 726 F.3d at 224. As the government has emphasized, the PTT is a non-government entity, making such constitutional concerns inapplicable, and the associated "special policy considerations" inapplicable.

As discussed above, courts in this Circuit frequently apply the four factors articulated in *Burka*, to determine whether disputed records are subject to the FOIA. 87 F.3d at 515. Courts have applied a different standard in limited circumstances "where documents originate within the Congress, the judiciary, and FOIA-exempt executive agencies" because "sometimes 'special policy considerations militate against a rule compelling disclosure of such records … merely because such documents happen to come into the possession of an agency.'" *Bureau of Nat. Affairs, Inc., vs. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984) (alteration in original) (quoting *McGehee v. CIA*, 697 F.2d 1095, 1107 (D.C. Cir. 1983)). These cases concern documents that originated with other branches of the federal government, frequently Congress. *See*, *e.g.*, *United We Stand America, Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004) (portions of IRS documents that would reveal Congressional requests to the agency were not agency records); *Goland v. CIA*, 607 F.2d at 343 (CIA's copy of a congressional hearing transcript marked "secret" was not an agency record). In reaching these decisions, the courts relied on "policy considerations unique to the congressional context." *United We Stand*, 359 F.3d at 599. Requiring release of the records "would force Congress 'either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role.'" *Id.* (quoting *Goland*, 607 F.2d at 346). The D.C. Circuit has also applied this reasoning to documents originating with the White House,

finding "comparable constitutional prerogatives" that required determining the documents were not agency records. *Judicial Watch II,* 726 F.3d at 224.

In contrast to documents originating with branches of government not subject to the FOIA, there is no basis to apply such special policy considerations to the PTT records. None of the cases cited by the government in support of this argument apply special policy considerations to *private* entities' documents in the possession of agencies. And the government repeatedly asserts that the PTT is a "private, non-profit organization." *See*, *e.g.*, Def. Mem. at 10. Nor would any of the constitutional prerogatives considered relevant to Congress—including its oversight responsibilities—or the White House—confidential decision making—apply to the PTT. *Cf. United We Stand*, 359 F.3d at 599, *Judicial Watch II*, 726 F.3d at 224. In short, special policy considerations do not prevent the conclusion that the records at issue here are agency records.

## Conclusion

For the foregoing reasons, Plaintiff requests that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion for Partial Summary Judgment —holding that the records at issue are agency records subject to production under the FOIA and ordering the agency to produce responsive non-exempt records to Plaintiff promptly.

A proposed order is attached.

Respectfully submitted,

October 19, 2018

/s/ *Robin F. Thurston*
Javier M. Guzman (D.C. Bar No. 462679)
Robin F. Thurston (D.C. Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jguzman@democracyforward.org
rthurston@democracyforward.org
*Counsel for Plaintiff*

19