**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                               |   |                              |
|-----------------------------------------------|---|------------------------------|
| DEMOCRACY FORWARD FOUNDATION,                 | ) |                              |
| Plaintiff,                                    | ) |                              |
| v.                                            | ) | Case No. 18-cv-01037 (APM)   |
| U.S. GENERAL SERVICES ADMINISTRATION,         | ) |                              |
| Defendant.                                    | ) |                              |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

Defendant U.S. General Services Administration ("GSA") is authorized by statute to supply email hosting services for a President-elect's transition team, and it did so for President-elect Trump after the 2016 election. GSA was to have destroyed the Trump transition team's electronic communications after the transition period ended, but due to law enforcement interest in those records, GSA instead duplicated them, maintained a copy, and turned a copy over to the Department of Justice. GSA still maintains actual possession of the Trump transition team's electronic communications.

Plaintiff Democracy Forward Foundation asked GSA to disclose certain of these records under the Freedom of Information Act ("FOIA"), but GSA refused. GSA maintained that, notwithstanding its actual possession of the requested material, the Trump transition team's emails did not qualify as "agency records" subject to FOIA. Plaintiff then brought this action to compel production of the requested records.

For the reasons outlined below, the court agrees with GSA that the Trump transition team's electronic communications are not "agency records" for purposes of FOIA and, therefore, are not subject to disclosure. Accordingly, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     *GSA's Hosting of Network Services for Presidential Transition Teams*

The Presidential Transition Act of 1963 ("Act"), Pub. L. 88-277, 78 Stat. 153, 3 U.S.C. § 102 (note), authorizes GSA to offer "necessary services" to "each President-elect and each Vice President-elect, for use in connection with his preparations for the assumption of official duties as President or Vice President." Act § 3(a). The "necessary services" include "office machines and equipment" and "[c]ommunications services found necessary by the President-elect or Vice President-elect." *Id.* §§ 3(a)(1), (5); Mem. in Support of Def.'s Mot. for Summ. J. ECF No. 11 [hereinafter Def.'s Mem.], at 3. GSA has provided telecommunications and internet technology services to presidential transition teams since 2000. Def.'s Mem., ECF No. 11-1, Erik Simmons Decl. [hereinafter "Simmons Decl"], ¶ 2; Def.'s Stmt. of Facts, ECF No. 11-3 [hereinafter Def.'s Facts], ¶ 1. Such services include maintaining the necessary networking infrastructure, including network security, and network communication services, such as email. *See* Simmons Decl. ¶ 2; Def.'s Facts ¶ 9.[1]

As one might expect, GSA takes care to keep separate the transition team's network from its own. The transition team's "networks are distinct from GSA's internal network infrastructure

---

[1] Starting in 2010, GSA also has supplied similar services for the "pre-election" transition of major candidates. *See* Pre-Election Presidential Transition Act of 2010, Pub. L. 111-283, 124 Stat. 3045. For the 2016 presidential campaign, GSA provided services to both major party candidates in advance of the election. *See* Def.'s Facts ¶ 8.

and are not used to conduct GSA's day-to-day agency business." Def.'s Facts ¶ 1. Furthermore, the transition team's communications are sent from accounts with the domain "@ptt.gov," as opposed to the "@gsa.gov" domain used by GSA officials. *Id.*; Simmons Decl. ¶ 2. Although GSA monitors transition team networks to "keep them operational and secure," "GSA officials do not access or review the emails of members of the presidential transition in order to conduct the agency's day-to-day business . . ." Def.'s Facts ¶ 2.

Before 2012, GSA hosted transition team email communications on physical servers located at GSA. Def.'s Facts ¶ 3. That changed in 2012, when GSA switched to a cloud-based email service provided by Google. *Id.*; Simmons Decl. ¶ 5. With respect to both the 2008 and 2012 election cycles, GSA destroyed the transition teams' electronic communications, whether hosted on physical servers or as cloud data. Def.'s Facts ¶¶ 5, 7.

On August 1, 2016, then-candidate Trump reached an agreement with GSA for telecommunication and internet technology services for both the pre- and post-election transition period. *Id.* ¶ 10. The parties memorialized the agreement in a Memorandum of Understanding ("MOU"). *Id.*; *see also* Decl. of Michael J. Gerardi [hereinafter Gerardi Decl.], ECF No. 11-2, Ex. A, Mem. of Understanding Between the GSA and Donald J. Trump, [hereinafter MOU]. GSA used Google's cloud-based email service to host the Trump transition team's electronic communications, Simmons Decl. ¶¶ 4, 7, and it supplied laptops and smartphone devices for the transition, Def.'s Facts ¶ 12. Under the MOU, the transition team agreed to return all equipment by February 19, 2017, and GSA promised to delete all data from those devices. MOU at 10. The MOU, however, did not expressly address whether GSA would dispose of cloud-based email after the transition period concluded. *See generally* MOU; Mem. in Support of Pl.'s Mot. for Partial Summ. J. and Opp'n to Def.'s Mot. for Summ. J., ECF No. 13-1 [hereinafter Pl.'s Mem.], at 3.

In January 2017, the Trump transition team and GSA agreed to extend GSA's services. *See* MOU at 25.[2] The extension agreement required return of government-issued equipment by March 31, 2017. *Id.*

### 2. *GSA Turns Over Transition Team Records*

In February 2017, GSA staff responsible for managing the Trump transition team's communication system approached GSA's general counsel to inquire about preserving transition team records. Decl. of Seth Greenfield, ECF No. 17-1 [hereinafter Greenfield Decl.], ¶ 3. "In light of publicly reported investigations of a criminal and national security nature surrounding members of the transition team who were using GSA-supported transition communication services, GSA concluded that it should seek guidance before taking any further action." *Id.* GSA's Inspector General then consulted with the Department of Justice and the Federal Bureau of Investigation. *Id.* ¶ 4. Law enforcement instructed GSA to preserve the records. In an email dated February 15, 2017, GSA's Office of General Counsel stated: "At the request of the Department of Justice, via our Office of Inspector General, please preserve all records of the Presidential Transition Team. Electronic equipment including cell phones, laptops, and tablets returned to GSA should be preserved and no information should be wiped from their memories." *Id.*, Ex. A, at 6 (CM-ECF pagination). GSA complied with the request. Simmons Decl. ¶ 8. GSA later received requests from other sources, including the transition team itself, to preserve the records. Greenfeld Decl. ¶ 5.[3]

---

[2] The court uses CM-ECF pagination for this document.

[3] Plaintiff asserts that GSA's decision to preserve the records was voluntary, citing a June 8, 2017, email from a GSA senior attorney to Lennard Loewentritt, GSA's Deputy General Counsel, stating that "normally GSA would destroy the records and wipe the machines, but given the news cycles, GSA decided it was prudent to inquire about preservation during the machine wiping process." Pl.'s Stmt. of Material Facts as to Which There Is No Genuine Dispute and Stmt. of Disputed Facts ECF No. 13-2 [hereinafter Pl.'s Facts], ¶¶ 2–3. The Greenfeld Declaration and its attached exhibits, however, make clear that, while GSA sought direction from law enforcement about the transition team records, the Department of Justice directed GSA to preserve the records. Thus, its preservation decision was not "voluntary" in the sense that Plaintiff suggests.

In August 2017, GSA and the FBI agreed to procedures for turning over the transition team's records. GSA agreed to give the FBI the devices used by the transition team with the understanding that the FBI would attempt to access them only with proper legal authority. Greenfeld Decl., Ex. B at 8 (CM-ECF pagination). With respect to email communications stored in Google cloud accounts, GSA copied and transferred the data of certain senior transition officials identified by the FBI. Simmons Decl. ¶ 9; Greenfeld Decl., Ex. C at 10 (CM-ECF pagination). GSA did not read, search, or review any of the transferred data. Simmons Decl. ¶ 9.

### 3. Plaintiff's FOIA Request

On January 5, 2018, Plaintiff Democracy Forward made a demand under FOIA for the following records:

> Any and all correspondence, including attachments, to or from "ptt.gov" email addresses associated with Rick Dearborn, Mike Pence, Michael Flynn, Rudy Giuliani, Chris Christie, Jeff Sessions, Ben Carson, K.T. McFarland, Pam Bondi, Jared Kushner, Rebekah Mercer, Steven Mnuchin, Devin Nunes, Anthony Scaramucci, Peter Thiel, Reince Priebus, Steve Bannon, Donald Trump Jr., Eric Trump, Ivanka Trump, and Omarosa Manigault on any server controlled by the General Services Administration.

FOIA Request, Attachment A to Compl., ECF No. 1-1; Compl. ¶ 10. GSA answered Plaintiff's FOIA request on February 8, 2018. It stated: "After a careful review of our files, it has been determined that GSA has no records of the information that you have requested. Therefore, we are unable to accommodate your request." Compl. ¶ 14.

Not satisfied with this response, Plaintiff sought administrative review. GSA denied the appeal. *See* Attachment C to Compl; Compl. ¶ 18. Although GSA acknowledged that it had "physical custody" of the requested records, GSA explained that "presidential transition team [ ] emails . . . are not considered agency records . . . . and thus are not subject to the FOIA . . ." Attachment C at 1–2.

### B. Procedural Background

Plaintiff filed this action on May 2, 2018. *See* Compl. Defendant filed its Motion for Summary Judgment on September 7, 2018. *See* Def.'s Mem. Plaintiff filed its Cross-Motion for Summary Judgment on October 19, 2018. *See* Pl.'s Mot. for Partial Summ. J. ECF No. 13 [hereinafter Pl.'s Mot.]. The parties' motions are now ripe for review.

## III. LEGAL STANDARD

Most FOIA cases are appropriately decided on motions for summary judgment. *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court may award summary judgment in a FOIA case by relying on the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted). The agency's affidavits or declarations must "describe the documents and the justifications for nondisclosure with reasonably specific detail [and] demonstrate that the information withheld logically falls within the claimed exemption." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Further, they must not be "controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Id*.

It is the government agency's burden to prove that it has complied with its obligations under FOIA. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter *de novo*.'" *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency

has improperly withheld extant agency records." *Span v. DOJ*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *Tax Analysts*, 492 U.S. at 142).

## IV. ANALYSIS

The sole question before the court is whether the emails of President Trump's transition team are "agency records" subject to disclosure under FOIA. *See* 5 U.S.C. § 552(a)(4)(B) (conferring jurisdiction upon federal courts jurisdiction "to order the production of any *agency records* improperly withheld from the complainant") (emphasis added). The parties agree that the transition team itself is not a government entity covered by FOIA. Instead, their dispute centers on whether GSA's possession and management of the records renders them subject to disclosure under the statute. GSA asserts that neither its actual possession of the communications, nor any act taken with respect to them, converts them into "agency records." Plaintiff counters that by copying, retaining, and producing the emails to law enforcement, as well as by denying access to devices that might contain electronic communications, GSA exercised the type of "control" over the transition team's emails necessary to make them "agency records" disclosable under FOIA. This court's task is to determine whether GSA has carried its burden of showing that the documents requested are *not* "agency records." *See Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).

### A. General Principles

Although "Congress [under FOIA] limited access to 'agency records,' [it] did not provide any definition of 'agency records' in that Act." *Forsham v. Harris*, 445 U.S. 169, 178 (1980). Supreme Court and D.C. Circuit precedent fill this definitional void. In *Tax Analysts*, the Supreme Court held that to qualify as an "agency record" the document must satisfy two requirements. First, the "agency must 'either create or obtain' the requested materials." 492 U.S. at 144 (quoting

*Forsham*, 445 U.S. at 182). Second, "the agency must be in control of the requested materials at the time the FOIA request is made." *Id.* at 145. By "control," the Supreme Court meant "that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* In this case, the parties only contest the element of "control," so the court's analysis focuses on that factor.

Since *Tax Analysts*, the D.C. Circuit has grappled with the question of how much "control" is enough to render a document an "agency record." Generally speaking, the Circuit looks at four factors—referred to as the *Burka* factors—to make that determination. Those factors are:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Judicial Watch, Inc. v. Fed. Hous. Fin. Agency ("Judicial Watch I")*, 646 F.3d 924, 926–27 (D.C. Cir. 2011) (quoting *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996)). The D.C. Circuit has not said that any one factor is more important than the other.

The Circuit has not, however, reflexively adhered to the four-factor *Burka* test. *See Judicial Watch v. U.S. Secret Service ("Judicial Watch II")*, 726 F.3d 208, 220 (D.C. Cir. 2013) (*"*Our past application of the test reveals its considerable indeterminacy."). In particular, the "circuit has indicated that the standard, four-factor control test does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA." *Id.* at 221. In such circumstances, the first two factors of the *Burka* test—the intent of the document's creator and the agency's ability to use or dispose of the document—are "effectively dispositive." *Id.* The Circuit has taken this approach where the agency created records at the request of Congress, *see United We Stand America, Inc. v. IRS*, 359

8

F.3d 595, 599 (D.C. Cir. 2004); *Goland v. CIA*, 607 F.2d 339, 347 (D.C. Cir. 1978); *Judicial Watch II*, 726 F.3d at 221–22 (discussing cases), or the Office of the President, *see Judicial Watch II*, 726 F.3d at 222–23. In these cases, "special policy considerations" were at stake, prompting the court to eschew *Burka*'s four-factor inquiry. *Id.* at 221 (citation omitted); *see also Bureau of Nat'l Affairs v. Dep't of Justice*, 742 F.2d 1484, 1491–92 (D.C. Cir. 1984) (stating that when "documents originate within the Congress, the judiciary, and FOIA-exempt executive agencies, sometimes special policy considerations militate against a rule compelling disclosure of such records merely because such documents happen to come into the possession of an agency") (cleaned up).

In a recent FOIA action, the Circuit found both the *Burka* and *Judicial Watch II* tests to be ill-fitting. In *Cause of Action v. National Archives and Records Administration*, the plaintiff sought records from the National Archives that were created by the Financial Crisis Inquiry Commission, a legislative branch agency not subject to FOIA. 753 F.3d 210, 212 (D.C. Cir. 2014). The question before the court was whether the Commission's records became subject to FOIA when turned over to the Archives. *See id.* The court found that, as applied to the Archives, *Burka*'s "four-factor test is divorced from FOIA's key objective—revealing to the public how federal agencies operate" and therefore declined to apply it. *Id.* at 215. The court likewise did not use the *Judicial Watch II* test. "Like the four-factor test, the *Judicial Watch II* test also measures 'control' in a way that is foreign to the *sui generis* nature of the Archives." *Id.* Instead, the court focused on first principles, treating the question as one of "statutory interpretation and congressional intent." *Id.* at 216. The court concluded: "[W]e are confident that Congress did not intend to expose legislative branch material to FOIA simply because the material has been deposited with the Archives." *Id.*

9

### B. Applying First Principles of FOIA

With this background in mind, the court must first decide what test to apply. Plaintiff insists that the court use the *Burka* factors and that no "special policy considerations" warrant departure from that framework. *See* Pl.'s Reply in Support of Pl.'s Mot., ECF No. 19, at 4–13. GSA, on the other hand, primarily argues that "special policy considerations" govern presidential transition team records, rendering the *Burka* factors inapt. Alternatively, it argues, even if the *Burka* factors are applicable, the transition team's emails are not "agency records." *See* Def.'s Combined Opp'n to Pl.'s Mot. And Reply in Support of Def.'s Mot., ECF No. 17, at 2–5.

Whether or not the court treats this case as one involving "special policy considerations"—the scope of that concept being unclear—the court agrees with GSA that the four criteria of *Burka* are ill-suited to the inquiry here. Indeed, like the National Archives, GSA here functioned mainly as a "warehouse" for the transition team's electronic communications. *Cause of Action*, 753 F.3d at 216. It supplied a network to host and store records, but never intended to use and did not use the records in any way. Rather, it agreed to destroy the records—although it ultimately preserved them as the direction of law enforcement. *Burka*'s four factors are thus "entirely unhelpful" in this case because they say little about the "nature and use of a document," which lies at the heart of the "agency record" inquiry. *Id.*

The court therefore looks to first principles to guide its decision. "FOIA's central purpose is to ensure that the *Government*'s activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed." *U.S. Dep't of Justice v. Reporters Committee For Freedom of Press*, 489 U.S. 749, 774 (1989) (italics in original). Therefore, a "document that could not reveal anything about agency decisionmaking is not an 'agency record.'" *Judicial Watch I*, 646 F.3d at 928. Stated

10

differently, "[t]he public cannot learn anything about agency decisionmaking from a document the agency neither created nor consulted, and requiring disclosure under these circumstances would do nothing to further FOIA's purpose of 'open[ing] agency action to the light of public scrutiny.'" *Id.* (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976)).

Applying these fundamental precepts here makes evident that the Trump transition team's email communications are not "agency records." The GSA did not create the records. Nor did it review, search or consult them. It did not use them in any way. Def.'s Stmt. of Facts ¶ 15; Pl.'s Stmt. Disp. Facts at 5 (not disputing). At most, GSA "might" have been exposed to the content of communications but only incident to its monitoring of the transition team's networks to ensure their operation and security. Def.'s Stmt. of Facts ¶ 2. In short, there is nothing about the documents' contents that would shed any light about GSA's operations or decision-making. Therefore, the transition team's emails are not "agency records" subject to disclosure under FOIA.

The D.C. Circuit's decision in *Wolfe v. Department of Health & Human Services*—the only appellate decision addressing the status of transition documents—confirms this result. In *Wolfe*, the plaintiffs sought a report regarding the Department of Health and Human Services ("HHS") and corresponding documents that had been compiled by President-elect Reagan's transition team. 711 F.2d 1077, 1078 (D.C. Cir. 1983). When the transition team completed the report, it distributed copies to, among others, the HHS Secretary-designate and to one of his aides, David Newhall, who would become the Secretary's Chief of Staff. When he moved into his HHS office, Newhall brought copies of the transition report with him and placed them in a locked bookcase. Neither Newhall nor any other HHS employee ever used or consulted the report, except in connection with the litigation. *Id.* The court held that the transition team's report was not an "agency record." *Id.* at 1079–80. In so holding, the court emphasized that mere physical

11

possession of the document is not enough. Rather, there "must be some 'nexus' between the agency and the documents . . ." *Id.* at 1080. There was no such nexus with respect to the transition report because it "never entered the Department's files and/or resources," *id.*, and "no one in the agency ever read or relied upon these documents . . . ," *id.* at 1081. Based on these circumstances, the court found that the agency never "controlled" the transition records and thus they were not "agency records" subject to disclosure under FOIA. *Id. See also Ill. Instit. for Continuing Legal Educ. v. U.S. Dep't of Labor*, 545 F. Supp. 1229 (N.D. Ill. 1982) (cited with approval in *Wolfe*, and holding that a transition team "briefing book" was not an agency record).

The Trump transition team's electronic communications in this case are similar to the transition team report at issue in *Wolfe*. Like the report, the emails were never integrated into GSA's records systems. Nor did GSA personnel read or rely on the records, except perhaps incidentally to carry out its network security function. Thus, GSA did not sufficiently "control" the emails to qualify as "agency records." For its part, Plaintiff acknowledges *Wolfe* but makes no serious effort to distinguish it. *See* Pl.'s Mem. at 8. Plaintiff contends that *Wolfe* did not establish a "per se bar" to treating a transition team record as an "agency record" and that "in appropriate circumstances transition team documents could become agency records subject to FOIA." *Id.* at 8–9. Fair enough. But the factual differences between this case and *Wolfe* are not material. If anything, the case against FOIA's applicability is stronger here, because there is nothing about the transition team's emails that is germane to GSA's mission. At least the report in *Wolfe* concerned the agency itself.

In any event, the court is confident that when Congress authorized GSA to host and support the electronic communications of presidential transition teams, it did not intend to expose those records to FOIA—even under the unusual facts presented here.

## C. The *Burka* Factors

Although the court has found the *Burka* factors to be a poor fit in this case, the court nevertheless considers them in the interest of completeness. Recall, those factors are:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the records as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Judicial Watch I*, 646 F.3d at 926–27 (D.C. Cir. 2011) (quoting *Burka*, 87 F.3d at 515). Here, each factor weighs against a finding of agency control over the transition team records.

*Intent of the Creator.* Looking at the first factor, the facts do not establish that the Trump transition team intended to relinquish control over its email to GSA. First, as GSA points out, it has long taken the public position that transition documents are not subject to FOIA. Def.'s Mem. at 15 (citing Ex. E, ECF No. 11-2 [hereinafter Def.'s Ex. E]). The Trump transition team thus would have had no reason to expect that by merely hosting its communications, GSA would come to "control" them. Second, the Memorandum of Understanding ("MOU") between GSA and the Trump's transition team provided that software and equipment would be returned to GSA "and all data on these devices will be deleted." MOU at 10. The Trump transition team therefore anticipated that its records would be destroyed. While Plaintiff notes that the MOU does not speak to cloud-based data, it is doubtful that the transition team would have expected that such communications would be treated differently than those stored on devices. In fact, GSA has deleted emails kept in cloud storage in the past. *See* Def.'s Facts ¶ 7; Simmons Decl. ¶ 6. Nothing about GSA's arrangement with the Trump transition team suggests any different treatment for its emails.

Plaintiff does not argue that the Trump transition team from the outset intended to hand over control of its emails to GSA. Instead, it cites later events. Plaintiff points to (1) the transition team's apparent failure to "act[ ] to retain control of the cloud-based records following Inauguration Day" and, further notes that (2) when the transition team "became aware of third-party preservation requests regarding its records, it delegated preservation work to GSA rather than seeking to take control of the records on its own." Pl.'s Mem. at 10. Thus, Plaintiff contends, "[o]nce it became clear that GSA would not be disposing of the records per historical practice," the transition team's "decision to permit GSA to continue retaining them counsels against the conclusion that the [transition team] intended to retain control of the records." *Id.* at 10–11.

But it is a dubious proposition that the transition team had any right or ability to "take control of the records" once it became known that there was a law-enforcement interest in them. As GSA explains, in early February 2017, agency personnel approached the GSA's General Counsel about whether to preserve the transition records in light of public reports of a criminal and national security interest in transition team members. *See* Greenfeld Decl. ¶ 3. On or about February 15, 2017, less than a month after the Inauguration, the Department of Justice asked GSA to "preserve all records of the Presidential Transition Team. Electronic equipment . . . returned to GSA should be preserved and no information should be wiped from their memories." *Id.*, Ex. A. Given this request, it is improbable that the Trump transition team could have demanded return of the records from GSA *and* insisted that GSA not retain a copy. The first *Burka* factor weighs against attributing control of the documents to GSA.

*Ability of Agency to Use and Dispose of Records.* With respect to the second factor, Plaintiff argues that GSA's control is "demonstrated by its unilateral decision to preserve [the records], voluntarily disclose them to law enforcement agencies, and restrict [the transition team]'s

access to them." Pl.'s Mem at 14. According to Plaintiff, "[w]hile GSA may not have had the authority to use and dispose of the records as it saw fit during the normal course of the Presidential transition, it necessarily assumed that authority when it independently decided to preserve the records rather than dispose of them, to limit [the transition team]'s access to them, and to turn them over to the Special Counsel without the [the transition team]'s consent." *Id.* But this argument ignores that GSA did not use or dispose of the records "as it s[aw] fit," but only preserved and transmitted them at the request of law enforcement. Plaintiff says the decision to preserve was "voluntary" because it was not compelled by process. Pl.'s Mot. at 13–14. That is technically true. But it cannot be that the decision to comply with a request by law enforcement to preserve records converts a record not otherwise subject to FOIA into one that is. The second *Burka* factor thus points to the absence of control.

*The Extent to Which Agency Personnel Read or Relied Upon the Document* and *the Degree of Integration into the Agency's Record System or Files*. Like Plaintiff, the court addresses the third and fourth factors together. *See* Pl.'s Mem. at 14–15. Plaintiff does not challenge GSA's representation that its personnel did not read or rely upon any transition team emails, except incident to its security function, or that the transition team's records were not integrated into the agency's own system. Instead, Plaintiff contends these factors favor a finding of agency control because, "over time, GSA increasingly treated [the records] as a body of information containing information potentially relevant to an investigation that it had compiled and was managing on the FBI's behalf." Pl.'s Mem at 15. But this argument finds no support in any case law, and importantly is divorced from reality. There is no evidence that GSA "managed" the records on the FBI's behalf. GSA simply copied the records in its possession and turned them over as
15

requested by the FBI. Nothing more. That action does not convert the transition team's records into "agency records" subject to FOIA.

Before concluding, it is worth noting that Plaintiff attempts to obtain records from GSA that it almost certainly could not obtain in full directly from the Department of Justice. Had Plaintiff sought the same records from the Department of Justice, the Department surely would have asserted multiple Exemptions—including Exemption 3 (grand jury material) and Exemption 7 (law enforcement records)—to avoid disclosure. It cannot be that FOIA permits a requester to avoid applicable law enforcement-related exemptions simply by going to the agency that is the physical repository of that material. That would be the odd result here if the court were to embrace Plaintiff's position.

## V. CONCLUSION

For the reasons discussed in this Memorandum Opinion, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

Dated: July 2, 2019

Amit P. Mehta
United States District Court Judge